## SMITH v. DENTAL PRODUCTS CO., Inc., et al. (two cases).

### Nos. 8278, 8279.

Circuit Court of Appeals, Seventh Circuit.

Jan. 14, 1944.

Rehearing Denied Feb. 17, 1944.

142

James R. McKnight, of Chicago, Ill., Marie K. Saunders, of Washington, D. C., and Harold E. Allport, of Los Angeles, Cal., for Arthur E. Smith.

Max W. Zabel, W. Bayard Jones, Francis V. Healy, and Melvin L. Goldman, all of Chicago, Ill. (Zabel, Carlson, Gritzbaugh & Wells, and Goldman, Allshouse & Healy, all of Chicago, Ill., of counsel), for Dental Products Co. Inc., and others.

Before MAJOR and MINTON, Circuit Judges, and LINDLEY, District Judge.

MAJOR, Circuit Judge.

This is an appeal from a decree of the lower court, entered December 2, 1942, in a suit by plaintiff against defendant[1] alleging trade-mark infringement, unfair competition and patent infringement, and to recover damages and profits occasioned by such infringement and unfair acts. The

---

[1] In this opinion, the word defendant will refer to the corporate defendant, except in such instances as the defendant Stratford is specifically mentioned. Another named defendant Frame was not served with process and consequently was not a party in the court below and is not a party here.

District Court dismissed the complaint so far as it related to trade-mark infringement and unfair competition, but declared the patents in suit valid and infringed and directed an accounting. No. 8278 is plaintiff's appeal from that portion of the decree unfavorable to him, and No. 8279 is defendants' appeal from that portion of the decree unfavorable to them.

We shall first consider the appeal in No. 8278, in which plaintiff seeks to reverse that portion of the decree which dismisses his complaint as to trade-mark infringement and unfair competition. Plaintiff is a dentist and oral surgeon of nation-wide reputation. So far as pertinent to this case, his activities commenced in 1914, since which time he has specialized in a certain type of anesthetic used by dentists. The technique of administering this anesthetic is called nerve blocking, and the anesthetic used for such purpose is generally called "conductive" or "conduction" anesthetic. In connection with this technique, plaintiff has done a large amount of research work, partially devoted to instruments by which conductive anesthetic may be administered to a patient. From 1914 to 1918, plaintiff devoted a large amount of his time to lectures which were given before many and perhaps practically all of the dental schools and state societies in the United States. In connection with such lectures, numerous instruments and medicaments were created and used by him. His lectures were largely attended by men who were eminent in the profession or who subsequently became so, and a considerable demand was created for the instruments and medicaments explained in his lectures. In order to supply this demand, plaintiff had a quantity of such items manufactured. He coined, adopted and was the first user of two of the trade-marks relied upon in this suit, Conducto and Den Pro, to identify his goods. Attached to his goods were printed labels bearing such trade names. The third trade-mark declared upon in this suit, Conducto Unitube, will be subsequently referred to.

The defendant is a corporation which has been continuously, since the year 1916, engaged in the business of selling dental supplies to dentists through dealers or supply houses. It does not practice the profession of dentistry and it does not sell any drugs or supplies to the public generally, that is, the patients of dentists.

After plaintiff had pursued for some four years the activities above suggested, we find the beginning of a series of transactions between him and the defendant, which in the main form the basis for the instant controversy. Such transactions include the making of three written agreements, designated by plaintiff as license agreements. The first of such agreements was entered into September 18, 1918, the second April 20, 1922, and the third and last August 27, 1930. The third was cancelled by plaintiff in accordance with its terms, effective February 10, 1935, for alleged breach of contract on the part of defendant. Later we shall make more detailed reference to these agreements. For the present it is sufficient to state that during all the time from the execution of the first agreement until the cancellation date of the last, defendant sold dental products and supplies in accordance with the terms of such agreements and paid plaintiff royalties provided thereby.

During the existence of such agreements, plaintiff filed an application in the United States Patent Office to register his trade-mark, Conducto Unitube. This application was rejected on two prior registrations of Conducto, taken out by defendant without plaintiff's knowledge. Upon plaintiff's demand, defendant on February 13, 1928 transferred to him by assignment the two registrations of the trade-mark Conducto. Subsequently, the rejection of plaintiff's application for registration of his trade-mark, Conducto Unitube, was withdrawn and a certificate of registration issued to him on September 17, 1929.

With this brief outline of the situation, we shall endeavor to state the contentions of the respective parties. In this connection, it is unfortunate that we are unable to discern, from the lower court's memorandum opinion or from its conclusions of law, the basis upon which plaintiff's cause was dismissed. The nearest approach to the problem appears in the following statement contained in the memorandum: "The entire theory of the plaintiff in this regard seems to be based upon alleged ownership of the trade-marks in question, as if it were similar to ownership of patents or other personal property." It would appear from this statement that the court's action was predicated on plaintiff's lack of ownership of the trade-marks in suit. The statement just quoted also appears in the court's conclusions of law, in connection with the

statement that plaintiff has failed to establish trade-mark infringement. As to the charge of unfair competition, the court, both in its memorandum opinion and conclusions of law, merely states that plaintiff has failed to prove the necessary elements.

Of the numerous contentions presented here, we are of the view that a decision is dependent upon the answer to two questions: (1) Was the plaintiff at the time of the execution of the first agreement with the defendant the owner of the trade-marks Conducto and Den Pro, and did he subsequently become the owner of the trade-mark Conducto Unitube? and (2) If so, did he abandon such ownership by reason of his agreements and course of conduct with the defendant? Plaintiff contends that (1) must be answered in the affirmative and (2) in the negative, while defendant contends to the contrary. As is apparent, plaintiff to succeed must sustain his position on both questions, while defendant will prevail if its contention is accepted as to either. In this connection, it is interesting and perhaps pertinent to note that defendant in its brief concedes that it infringes "if in fact these trade-marks are owned by plaintiff."

█ Defendant's argument that plaintiff was never the owner of the trade-marks in suit rests on the premise that they were never used by him in connection with a business or trade. Upon this premise, defendant relies principally on Hanover Star Mill Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713, and United Drug v. Theodore Rectanus, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141. These cases and others no doubt sustain defendant's contention to the effect that a trademark is treated as a protection for good will, is not the subject of property except in connection with an existing business or trade, and that its function is simply to designate the goods to which it is applied as the product of a particular trader and to protect his good will against the sale of another's product as his. It has also been held that no property right is concluded by the registration of a trade-mark. Patton Paint Co. v. Sunset Paint Co., 53 App. D.C. 351, 290 F. 326; Fulton Water Works Co. v. Bear Lithia Springs Co., 47 App. D.C. 437. Accepting the law as thus stated, we are confronted with the problem of ascertaining the soundness of the premise to which it is sought to be applied.

█ In the first place, the court below, notwithstanding its conclusion above stated, expressly found, in findings 6, 7 and 12, as follows:

"6. Beginning in 1914 Arthur E. Smith's name was associated with his new dental instruments and medicaments, which also bore his trade marks Conducto and Denpro.

"7. Arthur E. Smith was the original owner and user of the trade marks Conducto and Denpro on dental products and preparations.

"12. Arthur E. Smith was the original owner and user of the trade mark Conducto Unitube * * *."

We are of the view that such findings are amply supported by the evidence and must be accepted. We have heretofore briefly stated plaintiff's activities during the period prior to his first agreement with the defendant and we think it unnecessary to relate in detail the evidence which clearly shows that plaintiff was engaged in the manufacture, and sale in practically every portion of the United States, of dental supplies under the trade names Conducto and Den Pro, that such trade names were attached to his products in the form of printed labels, and that they were generally recognized by those of his profession as being the trade names for his products. (We have heretofore and will again refer to the circumstances under which plaintiff became the owner of the trade-mark Conducto Unitube.)

It appears appropriate in this connection to refer to defendant's counterclaim to the effect that it became the owner of the trade-mark Den Pro by use prior to that of the plaintiff, and that plaintiff's registration on October 8, 1935 was fraudulently obtained. We find nothing in the findings of the lower court with reference to this counterclaim. As already noted, the court did find that the plaintiff was the "original owner and user" of such trade-mark and dismissed defendant's counterclaim. We have examined the evidence bearing upon defendant's contention in this respect and are satisfied that it is without merit. As heretofore stated, the trade-mark Den Pro was extensively used by the plaintiff from 1914 until his first agreement with the defendant. The sole evidence relied upon by the defendant is that in 1916 it used on a certain product the abbreviation "Den.Pro. Co." As will be noted, this was

merely the name of the corporate defendant in abbreviated form and was used in connection with "Oryl," the trade-mark which it then employed. As testified to by defendant's witness: "In 1925 we had the Oryl scalers put out and that was Den. Pro. Co. Oryl; that was merely the abbreviation of the company's name, it was not a trade-mark."

■ It appears to be defendant's theory, illogical we think, that because plaintiff traveled about the country and sold his products in connection with lectures delivered by him, he was not engaged in any trade or business. It is pointed out that there is no evidence that he "had an established place of business." We know of no reason why a person must have an office, a store or a shop in order to be engaged in a trade or business. We should think that a person who peddles his wares from house to house, or who sells them on one street corner today and another tomorrow would be engaged in a business or trade, no less certainly than another who sells from a hole in the wall, even though he continues to do so day after day. Holding as we do that plaintiff was the owner and user of these trade-marks (Conducto and Den Pro), it follows that he was vested with a property right at the time of his first agreement with the defendant.

We now come to the somewhat more difficult question as to whether plaintiff abandoned his trade-marks by reason of the agreements entered into between him and the defendant. The latter's contention, as we understand it, is that abandonment was effected by plaintiff's non-use. In this connection, it is pointed out in considerable detail that the use of the trade-marks was that of the defendant, that it spent large sums of money in advertising the products sold under such marks, that it built up a large and prosperous business unaided and unassisted by the plaintiff, and, furthermore, that as the user of the marks it became the owner and entitled to continue such use after the cancellation of the last agreement. In other words, because of plaintiff's abandonment of ownership and its acquisition by defendant, there was nothing to revert to the plaintiff upon cancellation.

In opposing this argument, plaintiff relies in the main upon two propositions: (1) that by the terms of the agreements between the parties plaintiff retained the ownership of such trade-marks and that defendant's use of the same was in fact plaintiff's use, and (2) that defendant by the terms of the agreements, as well as by the character of its use of such marks and by other conduct, is estopped to dispute plaintiff's ownership.

■ The intention of the parties as shown by such agreements, as well as their conduct, would appear to be of controlling importance. It seems essential, therefore, to relate some of the more salient provisions of these agreements.

The 1918 agreement (first agreement) recites that plaintiff is the originator and inventor of numerous designated dental supplies which he "is desirous of placing upon the market" through the defendant. In consideration of certain royalties to be paid by the defendant, plaintiff does "covenant and grant to the said parties of the second part (defendant) the sole and exclusive privileges, right and authority to prepare and manufacture or cause to be prepared and manufactured and to sell or cause to be sold all of said preparations, goods and articles, throughout the world, at wholesale to retail dealers." The agreement is made applicable to "any and all changes, variations, or improvements hereafter to be made by said party of the first part (plaintiff)." Defendant is required to bear the cost and expense of manufacturing, demonstrating and advertising said products and is required to sell them under the "registered patent and trade-marks" of plaintiff, providing plaintiff "shall have procured the patents and trade-marks therefor."

Defendant is precluded, directly or indirectly, from advertising, manufacturing or selling any of the products referred to in competition with those of the plaintiff. It is provided that all goods mentioned and enumerated shall be advertised as "suggested by Dr. Arthur E. Smith" or "designed by Dr. Arthur E. Smith." Plaintiff's name is to be used in a "legitimate and ethical manner," with the requirement that copies of advertisements in which plaintiff's name is to be used shall be furnished and approved by him before publication. Plaintiff is authorized to change any formulas as he "deems necessary for scientific advancement." Royalty terms are fixed for all products, including "ampules," in case the parties decide to offer them to the trade. Defendant is required to keep books, which the plaintiff may in-

spect, of the sale of all articles, including "ampules." Defendant is permitted to change the ingredients of any of the designated articles only with plaintiff's consent. Plaintiff is given the right to terminate the contract upon ninety days' notice. It is provided that the parties shall share the expense of any litigation necessary to prevent infringement in case any person or corporation "without proper license or authority, make, use or sell, during the terms of this agreement, any of the above enumerated articles for which patents shall have been granted first party, or shall use first party's trade-mark * * * or in any manner infringe upon the said patents or trademarks."

The 1922 agreement (second agreement) continues in force and effect the first agreement, and its main purpose appears to be a change in the royalties to be paid by defendant. Nothing more need be said concerning this agreement.

The 1930 agreement (third agreement) follows closely the provisions of the first agreement, which need not be repeated. It is more specific as to the items to which it refers. Par. 4 states, "Arthur E. Smith does hereby grant to the Dental Products Company the sole and exclusive privilege, right and authority to prepare, manufacture and to sell the following articles covered by patents, applications for patents or sold under the name of Arthur E. Smith or under his trade names or trademarks." Then follow thirteen designated items. Item 11 is "Conducto unitubes or ampules or conducto anesthetic in other containers." Like the first agreement, it applies to and includes all improvements or new inventions thereafter made by plaintiff. Again, all of the enumerated items are required to be sold under the patents and trade-marks of the plaintiff, providing he procures such patents and trade-marks. Defendant is precluded from the manufacture or sale of any of such items in competition with plaintiff. Similar provisions are found with reference to advertising, and in addition, "the formula for the local anesthetic must be accompanied by the words 'Formula and method of Arthur E. Smith, M.D., D.D.S.'" Plaintiff is given the right to supervise labels and advertisements and to change formulas which he deems necessary for scientific advancement. Again, the parties are to share the expense of litigation in the event of infringement "of any

of the patents covering any of the inventions embodied in this contract." Also, plaintiff is given the right to cancel on ninety days' notice, and, as heretofore stated, this agreement was cancelled by him effective February 10, 1935.

We have heretofore decided, contrary to defendant's contention, that plaintiff was the owner of the trade-marks at the time the first agreement was executed. It is pointed out by the defendant that the trade-marks now relied upon were not specifically designated in any of the agreements and they could not have been transferred. Again we are unable to agree with defendant's contention. There is no doubt but that defendant entered into the first and subsequent agreements with positive knowledge of plaintiff's marks Den Pro and Conducto, and that during the life of the agreements and since, defendant has continuously used such marks. Undoubtedly they were included in and covered by the agreements.

Defendant makes the further contention that even though plaintiff was the owner of such marks at the time of the execution of the first agreement, such ownership was extinguished on the theory that they were no longer used by the plaintiff in connection with an established business. In other words, plaintiff retained nothing more than the naked title, and ownership was lost to the defendant by reason of the latter's use. Again defendant relies upon authorities such as Hanover Star Mill Co. v. Metcalf, supra, and United Drug v. Theodore Rectanus, supra, which, in our judgment, are not controlling. This is so for the reason that in the instant case defendant's use was definitely limited by the agreements between the parties. In none of the authorities relied upon by the defendant has it been held that the owner of a trade-mark loses such ownership by the mere grant to another of the privilege of its use.

Defendant construes, improperly we think, the agreements as assignments and argues abandonment on that basis. The case which comes nearest sustaining defendant's contention in this respect is that of MacWilliam v. President Suspender Co., 46 App.D.C. 45, wherein the court stated: "* * * where the owner of a trade-mark grants the right to another, either by sale or license, to use the mark on the goods with which its use is connected, and

abandons its use himself, he cannot afterwards either deprive his assignee of the right to its use or set up an adverse use."

In this case, however, the court had before it an outright assignment of a business and a trade-mark. Other than the fact that what the court said about a license appears to have been dictum, the authority is of little benefit to defendant unless plaintiff abandoned the use of his marks.

A reading of the agreements fixing the rights of the parties leaves no room for argument or doubt but that it was the intention of the parties that ownership in the trade-marks used by the plaintiff at the time of the execution of the first agreement, as well as those subsequently adopted by him, were to be and remain his property. We have heretofore related in some detail substantial portions of these agreements and shall not repeat. It is sufficient to observe that the trade-marks, even in the last agreement, are referred to as those of the plaintiff and that he retained well near absolute control over the manner of advertising, manufacture and sale of the products involved, as well as the manner in which his name and his marks might be used in connection therewith. Furthermore, there is proof to the effect that plaintiff, as was his right under the agreements, spent a considerable amount of time at defendant's plant, at least until the year 1930. On some occasions, he was there regularly for a week or a month at a time. While the record is somewhat deficient in describing the services actually performed by him, it is reasonable to conclude that he was exercising his rights as provided for in the agreements, in connection with the manufacture and sale of dental products made according to his formulas and sold under his name and trade-marks.

Of the numerous cases cited by plaintiff, the one most nearly in point, both on the facts and law, is that of Lawrence-Williams Co. v. Société Enfants Gombault et Cie, 6 Cir., 22 F.2d 512. In this case, plaintiff's predecessor, one Gombault, invented a horse liniment which he sold under the trade-mark "Gombault's Caustic Balsam," with a picture of a farm scene and a jockey mounted on a horse. Gombault in 1880 contracted with one Lawrence, defendant's predecessor, whereby for a period of ten years Lawrence was to have the exclusive right to sell said liniment as sole proprietor for the United States. The labels were to carry the trademark and the signature of Gombault. Three contracts continued the arrangement for thirty years, and the last one terminated in 1925.

The court held that the defendant, Lawrence's successor, had no right after the termination of the contract to continue use of the trade-mark on liniment or to register it in the United States Patent Office. In so holding, the court made numerous observations highly pertinent, as well as unfavorable, to defendant's contentions in the case at bar. On page 514 of 22 F.2d it said: "The status of plaintiff's business when the first contract was made was such as entitled it to the exclusive use of the name in the selling of caustic balsam liniment. * * * Nor was there any assignment or abandonment of the name * * *. Contrarily there was, we think, a definite understanding between the plaintiff and the defendant that the name should belong to the plaintiff * * * always displaying the name Gombault, conspicuously in its advertisements, and on its labels * * * as to indicate the origin of the remedy. It thus appears to have been the purpose of the defendant to preserve the identity of the name with plaintiff's product. This was successfully done, presumably to defendant's advantage; and even though it has built up its business solely on the Gombault name, it cannot, in view of the understanding referred to, assert ownership thereof as against plaintiff."

There are a number of authorities to the same effect, and emphasis seems to be placed upon the intention of the parties. In Stratton et al. v. Stiglitz Furnace Co., 258 Ky. 678, 81 S.W.2d 1, 4, the court said: "Nothing appears in the contract or elsewhere which indicates any intention of the parties, respectively, to give up or to take over the trade-mark Monarch, except for the limited purpose of the contract. When that contract came to an end, appellant's rights to any use of the mark likewise came to an end."

In Morand Bros. v. Chippewa Springs Corp., 7 Cir., 2 F.2d 237, this court on page 239 said: "While the contract does not specify that at the end of that time appellant should cease using appellee's trade-name, under which it was selling its water from its spring of the same name, such

we regard as a necessary inference from the contract itself."

Again this court in United States Ozone Co. et al. v. United States Ozone Co. of America, 7 Cir., 62 F.2d 881, 887, said: "Not only is it the necessary inference under the evidence here that the right to use the trade-mark and trade-name was given appellants only for the duration and purposes of the sales contract, but appellants specifically agreed in the 1925 contract to protect the sterilizer company's patents, trade-marks, and trade-names by giving notice of any infringement thereof coming to their knowledge."

Another pertinent observation is found in Hicks, Alien Property Custodian v. Anchor Packing Co. et al., 3 Cir., 16 F.2d 723, 726: "A grant of an exclusive use of a trade-mark, limited as to duration and place, whether made in contracts for sale of its associated wares or by specific license, does not .convey title or establish ownership of the trade-mark in the licensee or in one who purchases marked goods for resale."

■ We think the conclusion is inescapable that plaintiff during the life of the contracts retained not only the naked title to his trade-marks but the ownership as well, subject only to defendant's rights as contained in the agreements, and that plaintiff upon expiration of such agreements was entitled to the full use and enjoyment of such trade-marks. An important purpose of the agreements was to protect plaintiff in his ownership of such marks, as well as to protect defendant in its limited right of user. We are not impressed with the materiality of the argument that defendant spent large sums in advertising and thereby acquired ownership of the trade-marks. Whatever it did in this respect presumably was for the benefit of both parties as contemplated by the agreements, and certainly its rights were limited by the express terms thereof.

■ Moreover, we are of the view that defendant is estopped by the terms of the agreement and its acts and conduct to claim title or ownership in such marks. "Its recognition by defendant and the subsequent sale of cars bearing it operated as an estoppel of a denial of a property right therein." Ritz Cycle Car Co. v. Driggs-Seabury Ordnance Corp., D.C., 237 F. 125, 128. At no time from 1918 to 1935 did defendant make any claim to or contest plaintiff's title or ownership in these trade-marks. During all this time it paid royalties for their use. It is true that defendant obtained two registrations on the trade-mark Conducto, but when its impropriety in so doing was called to its attention by plaintiff, it promptly executed a formal assignment of such trade-mark to him. We are unable to perceive how this action on the part of defendant can be reconciled with its present claim of ownership. It amounts, so we think, to a plain recognition of plaintiff's ownership, and this more than ten years after the execution of the first license agreement.

■ Defendant makes the further contention that the trade-mark Conducto Unitube was confined to ampules sold from 1927 to 1934, and that the sales of ampules during that time aggregated more than a quarter of a million dollars. It is emphasized that the use of this trade-mark could not have been other than that of the defendant. We have already noted that plaintiff obtained a registration on this mark only after defendant had assigned to him two registrations obtained by it on the trade-mark Conducto. These circumstances at least tend to show an acquiescence by defendant in plaintiff's right to the trade-mark Conducto Unitube. Furthermore, there appears no doubt but that the ampules sold under this trade-mark were in accordance with plaintiff's formula and that defendant so represented them to the public. In addition, the third license agreement, as heretofore noted, in specifying the items included therein specifically names "Conducto Unitubes or ampules." (As we understand, unitubes and ampules are synonymous terms.) This agreement was made some two or three years subsequent to the time when defendant commenced the sale of ampules under such trade-mark. We are of the view that under the agreements plaintiff was entitled to any trade-marks obtained by him on the general class of goods included in the agreements subsequent to their execution, but whether this be true or not, defendant under the circumstances related is precluded, so we think, from asserting claim to ownership in the trade-mark Conducto Unitube and from denying plaintiff's ownership thereof.

■ Defendant's defense to the charge of infringing the trade-marks in suit from the time of the cancellation of the third license agreement (1935) to date rests

solely upon the premise that it was the owner of said trade-marks at the time of such cancellation. Holding as we have that the premise is unsound, it follows that the defense cannot be sustained. We therefore conclude that defendant is liable for trade-mark infringement.

■ What we have said and held concerning the charge of trade-mark infringement is largely and perhaps entirely decisive of that of unfair competition. Defendant makes the following statement in its brief, undoubtedly the law: "The essence of trade-mark infringement, as is the essence of unfair competition, is passing off one's goods as those of another (Hanover Star Mill Co. v. Metcalf, 240 U.S. 403, 413, 36 S.Ct. 357, 60 L.Ed. 713, 718). There can be unfair competition without the existence of trade-mark infringement, but there can not be any trade-mark infringement without the presence also of those acts which amount to unfair competition."

The essence of defendant's argument against unfair competition is again predicated upon the erroneous theory that it had the same right after cancellation of the last agreement to use plaintiff's trade-marks and plaintiff's name as it had before. Defendant in its brief states: "Defendant's method of doing business has not changed radically in the past six years over its method prior to that time, so it can not be seen how any of defendant's acts could be called unfair to the plaintiff now, if they were not unfair prior to the time that plaintiff again claims to have engaged in business in 1935."

This statement ignores the decisive factor that prior to 1935 defendant's use of the trade-marks was as a licensee—by permission of plaintiff—and that when the license was terminated and permission thereby withdrawn all of the rights and privileges which defendant had enjoyed were terminated. Of course there could be no unfair competition between the parties as long as defendant's business was conducted by sufferance of the plaintiff, but a continuation of such business by defendant thereafter became unauthorized and unfair. In this connection, it may be noted that the agreements expressly precluded competition by the defendant during the life of such agreements.

■ Defendant also argues that there was no unfair competition, in fact no competition, because of the insignificant amount of business done by the plaintiff as compared to that of the defendant. We think it unnecessary to review the evidence in this respect. Admittedly, plaintiff's sales were few in number, especially when compared with those of the defendant, but the fact remains that he was, after the cancellation of the license agreement, the owner and entitled to the use of his trade-marks. His use thereafter was sufficient, so we think, to negative any theory of abandonment. It is also contended that plaintiff, a professional man, never acquired any reputation with the public or the dental profession as being the commercial source of the products sold by defendant. If by commercial source is meant manufacture, we think the statement is accurate. There is proof, however, and without such the inference would be inescapable, that the public did recognize plaintiff as the originator of defendant's goods and that they were manufactured under his supervision and in accordance with his formulas.

Defendant again emphasizes its large and prosperous business, resulting from its favorable reputation with the public. We think this argument has been overdone; in fact, we strongly suspect that the growth of defendant's business has been due, in considerable part at least, to plaintiff's reputation in the dental field. Whether this be true or not, however, we must reject the argument to the effect that defendant must not be interfered with because its business is large and that of the plaintiff small. Defendant's predicament is the result of its own conduct. Plaintiff had no monopoly (unless it be patent) upon the sale of the goods included in the license agreements. Upon the cancellation of such agreements, defendant had a right to sell such goods under any trade-mark it saw fit, insofar as plaintiff was concerned, other than those of the plaintiff. In place of so doing, however, it continued the use of plaintiff's trade-marks, with the representation that the formulas by which its goods were made were those of the plaintiff, in the same manner as was permitted under the license agreements. The inevitable result was to deceive the public and to defraud the plaintiff.

■ We hold that the record sustains the charge of unfair competition, as well as trade-mark infringement. It follows

that plaintiff is entitled to an injunction and an accounting.

Plaintiff sought to hold the individual defendant Stratford for the infringing acts of the corporate defendant. We are now urged to sustain plaintiff's position in this respect.

■ There appears to be considerable contrariety of opinion as to when and under what circumstances an individual connected with a corporation is liable for the latter's acts, especially in cases of trademark and patent infringement. It appears from a study of the authorities that the question is largely dependent upon the facts and circumstances of each case. We see no reason to mention any of the numerous cases cited other than two decided by this court, namely, General Motors Corp. v. Provus, 7 Cir., 100 F.2d 562, relied upon by plaintiff, and Dangler v. Imperial Mach. Co., 7 Cir., 11 F.2d 945, relied upon by the defendant Stratford.

It is pertinent to observe that the record is silent as to the financial condition of the corporation. Certainly there is no proof that it was or is embarrassed financially or unable to respond in damages for which it may be liable. Also, there is no proof that it was merely a shell, a sham, or a cloak behind which Stratford sought to screen his personal activities. On the other hand, we think it is clearly shown that the corporation was a bona fide, active and going concern. Furthermore, the record is deficient in its disclosure as to the exact activities of Stratford in the conduct of the corporate affairs. Stratford was not a witness. It is admitted that he was president of the company, although there is no proof as to the amount of stock owned by him. There is proof that he was "in charge of the affairs of the company" and was general manager "in charge of the policies of the company." As will be noted, this testimony is largely the conclusion of the witness.

We are of the view that the instant situation is clearly distinguishable on the facts from that of General Motors Corp., supra, recently decided by this court. The facts are closer to those in the Dangler case, supra, although less favorable to individual liability than they were in that case. There, in holding against individual liability, we stated on page 947 of 11 F.2d: "* * * that, in the absence of some special showing, the managing officers of a corporation are not liable for the infringements of such corporation, though committed under their general direction. The uncertainty surrounding the questions of validity and infringement make any other rule unduly harsh and oppressive."

■ The burden no doubt was on plaintiff to prove a state of facts which would justify a holding against Stratford. This we think he has failed to do, and we hold that Stratford is not liable in his individual capacity.

In appeal No. 8279 are involved five patents issued to plaintiff, all found valid and infringed by the lower court. They are design patent No. 101,485 and mechanical patents No. 1,328,459, No. 1,384,-355, No. 1,718,602 and reissue No. 17,906. An accounting was ordered for the purpose of ascertaining damages sustained by reason of defendant's infringement, and both the corporate and the individual defendant Stratford were enjoined from further infringement.

Numerous questions are raised on this appeal other than those which go directly to the merits, that is, invention and infringement. In fact, the questions argued, if properly "rationed," would furnish the material for several law suits. One of the important questions raised by defendant is that the proof fails to show compliance with R.S. § 4900, 35 U.S.C.A. § 49, requiring notice of infringement. It is urged that such failure is fatal to plaintiff's right to recover damages for the period prior to commencement of suit, and this irrespective of the conclusion which we may reach on the merits of the case. This question is of such importance that we think it should be first considered.

The statute imposes as a prerequisite to any recovery in a patent infringement suit, wherein the patentee has manufactured or sold an article under his patent, that he mark such article with his patent numbers, or in the alternative, that the defendant be "duly notified" of the alleged infringement. Plaintiff makes no contention, and we assume concedes, that his articles were not marked. For recovery therefor he must rely on the alternative method which the statute designates. The critical question for decision is whether the proof shows a compliance with such requirement.

Plaintiff contends that defendant had actual knowledge of the patents in suit by reason of the so-called license agree-

ments which we have considered in connection with appeal No. 8278. In addition, plaintiff relies on two written notices, (1) his notice to defendant of cancellation, and (2) a letter dated May 13, 1937 by one of his attorneys, to the defendant. The cancellation notice, dated November 3, 1934, states: "You are hereby notified that I have elected to cancel, on February 10, 1935, the contract dated August 27, 1930 between you and myself." The letter commences, "The patent situation in connection with Dr. Smith's numerous patents, trade-marks, etc., has been the subject of several conferences." Subsequently in the letter, we find the only language which could possibly be construed as notice. It reads: "As you undoubtedly know, Dr. Smith has very broad patent protection and your manufacture and sale is unauthorized and, in our opinion, constitutes an infringement, and Dr. Smith demands that an accounting be made at once and that he be paid for past infringement."

Plaintiff is very insistent in contending that no one could believe other than that defendant had notice of the patents in suit. We are inclined to agree with plaintiff in this respect, but the question cannot be decided on what plaintiff or we may believe as to defendant's knowledge. The question is whether the proof supports the allegation that defendant had actual notice. In Dunlap v. Schofield, 152 U.S. 244, on page 248, 14 S.Ct. 576, on page 577, 38 L.Ed. 426, the court, in discussing the statutory provision under consideration, said: "One of these two things, marking the articles, or notice to the infringers, is made by the statute a prerequisite to the patentee's right to recover damages against them. Each is an affirmative fact, and is something to be done by him. * * * the statute expressly puts upon him the burden of proving the notice to the infringers, before he can charge them in damages. By the elementary principles of pleading, therefore, the duty of alleging, and the burden of proving, either of these facts is upon the plaintiff."

Defendant asserts in its brief that plaintiff had some fifty patents on dental products. While we find nothing in the record which directly sustains this assertion, it is not disputed by plaintiff. "Dr. Smith's numerous patents" and his "broad patent protection" are the expressions used in the letter referred to above. The fact is that in the instant case ten patents were declared upon in the complaint, but proof was offered only as to the five involved in this appeal. We are justified in assuming that plaintiff had a large number of patents. It is also pertinent to observe that so far as we are able to ascertain none of defendant's products sold during the period of the license agreements, nor any of plaintiff's products sold either prior or subsequent to such agreements, bore any notice of any of plaintiff's patents. Some of them bore the designation "Patent Applied For." The only patent specifically mentioned in any of the agreements was No. 1,243,349, not involved in this suit. True, the agreements refer to "plaintiff's inventions," and articles "for which patents shall have been granted," as well as articles "covered by patents, applications for patents," and makes provision for sharing the expenses in prosecuting "any infringement of any of the patents covering any of the inventions embodied in this contract."

Plaintiff argues that inasmuch as defendant paid royalties in conformity with the license agreement, it must have had knowledge of his patents. This argument has a superficial plausibility, but it cannot be accepted as a substitute for proof of notice. This is so for the reason that there is nothing to show what portion of such royalties was for the use of plaintiff's trade-marks (appeal No. 8278), and what portion, if any, was as a licensee of plaintiff's patents. Furthermore, even though we assume that a portion was paid as a licensee of patents, there is nothing to indicate what portion, if any, was paid on account of the particular patents involved in this suit. Certainly general knowledge on the part of the defendant that plaintiff was the owner of a large number of patents or that it had been granted blanket protection from plaintiff's far flung monopoly in the trade-mark and patent field was not sufficient to constitute notice of the particular patents in suit. In this connection, we express the view that no assistance is rendered plaintiff's contention by reason of the cancellation notice or letter to which we have heretofore referred.

Plaintiff's contention, so we think, misconstrues the requirements of the statute concerning notice. What constitutes proof "that the defendant was duly notified of the infringement" must be determined in connection with the statutory

provision as a whole. Notice to the public generally is provided by affixing upon the article "the word 'patent,' together with the number of the patent," or by affixing to the package enclosing such article "a label containing the like notice." It is also provided, with reference to patents issued prior to a certain time, that such notice may be sufficiently given in the following form: " 'Patent,' together with the day and year the patent was granted." Thus the patentee is given his choice of complying with the requirements just stated or by making proof that the defendant "was duly notified." We are of the view that where the plaintiff elects to rely upon the latter method, proof must be made no less definite and certain than that required where he elects to rely upon the former. As was said in Franklin Brass Foundry Co. et al. v. Shapiro & Aronson, Inc., 3 Cir., 278 F. 435, 437: "Actual notice must be actually proved, and cannot be assumed as a legal inference from any facts which amount not to actual proof of the fact, and we think that a defendant is not 'duly notified,' within the meaning of the statute, unless the facts with which he is supplied would, if fixed upon the patented article, constitute 'sufficient notice.' " We agree with this construction of the words "duly notified."

■ It follows that an accused infringer must receive actual notice of the specific patent which he is alleged to infringe before he can be required to respond in damages. As was said in Parker Rust Proof Co. v. Ford Motor Co., D.C., 23 F.2d 502, 503: "Proof is required to show that the defendant was notified by the plaintiff of the infringement, and recovery begins only from the date when plaintiff gave the notice specified in Section 4900 of the Revised Statutes."

We doubt if the notice required can be proved by circumstantial evidence, but whether so or not, we are certain that it cannot be proved by the uncertain and confused situation upon which plaintiff relies. Plaintiff cites two cases in support of its position, Pyle Nat. Co. et al. v. Lewin, 7 Cir., 92 F.2d 628, by this court, and T. C. Weygandt Co. v. Van Emden, D.C., 40 F.2d 938, a decision by the Southern District Court of New York. The former case merely held that a finding of the District Court that proper notice was given was supported by substantial evidence, and is of no benefit to the plain-tiff. Upon the facts disclosed in the latter case, we do not agree with the court's conclusion.

■ We therefore hold that plaintiff failed to sustain the burden of proving that defendant was "duly notified" of the patents relied upon in this suit and that the finding of the District Court that defendant had actual knowledge is without substantial support.

Design patent No. 101,485 was issued October 6, 1936, entitled "Design For An Ampule." The patentee claims: "The ornamental design for an ampule substantially as shown." We reproduce Fig. (1), disclosed by the patent as illustrative of the design.

The ampule embodying the patent design consists of a cylindrical glass container, the right end closed by a stopper and the left end constricted to form a neck portion. The latter end is covered by a cap and there appears to be an element, such as a collar, interposed between the cap and the neck of the ampule which extends beyond the cap so that it is visible. The ampule is of clear, transparent glass, without any surface ornamentation of any kind. Invention, therefore, if such there be, must reside solely in the configuration, that is, the lines which represent the sides and ends of the body of the container, together with the stopper at one end and the neck and collar at the other.

■ The essential elements of a design patent are that the claimed invention be "new, original and ornamental." Sec. 73, 35 U.S.C.A. It is well to keep in mind that the patent in suit does not relate to the ampule itself but merely to the design created by the ampule's configuration. It may be noted that plaintiff's reissue patent No. 19,219 covered the ampule. This patent, declared upon in the complaint in this suit, was apparently abandoned at the trial.

■ Our attention is called to certain prior art patents which are claimed to invalidate this design patent. We see no occasion to consider them, for in our view the patent clearly discloses on its face that it is invalid for lack of invention. The design, predicated solely upon configuration of the ampule, was not conceived until the

size, shape, form and lines of the ampule itself were known. Upon formation of the ampule, its configuration giving rise to the design was the inevitable result. Such design could not have been other than what it is. If the configuration of the ampule based upon its shape, size and contour constitute invention, then the configuration of any and every transparent glass container would likewise constitute invention. Plaintiff states: "The simplicity of the lines and the proportions of Dr. Smith's design are modern and beautiful." We have no intention of attempting to establish the boundary lines of the field of things beautiful, but in our opinion a good deal of imagination is required to describe this design as either beautiful or ornamental. Whether so or not, the lines of which the design is composed were the inevitable result of the size and shape of the ampule and could not amount to invention.

Furthermore, it has been held that a purely functional design is not patentable. S. Dresner & Son, Inc. v. Doppelt et al., 7 Cir., 120 F.2d 50; Applied Arts Corp. v. Grand Rapids Metalcraft Corp., 6 Cir., 67 F.2d 428, 430. As was said in the latter case: "It was certainly not the intent of the law to grant monopoly to purely conventional design which is in itself little more than a necessary response to the purpose of the article designed. The scope of a design patent, as well as its originality, must depend on something more than this."

There can be no doubt but that the ampule itself is functional. It contains the anesthetic used by the dentist in a nerve blocking operation and is used in connection with a syringe. It could not be used otherwise, and its shape, size and contour must be such as will enable the operator to insert it in the barrel of the syringe. The ampule being functional, it is difficult to perceive how its mere configuration could be other than functional. If plaintiff's theory be correct, it would be immaterial whether the ampule could be the subject of a patent. Even though it be a non-inventive article, a monopoly could be obtained as a result of a design patent representing nothing more than its configuration. Such a theory would permit the obtaining of a monopoly upon an article non-patentable in itself by claiming a design embodying nothing more than the lines resulting from its shape and contour.

Little need be said concerning patents No. 1,328,459 and No. 1,384,355. The former issued January 20, 1920 and expired January 20, 1937; the latter issued July 12, 1921 and expired July 12, 1938. The lower court found that these two patents were infringed between the time of the cancellation of the license agreement and the expiration of the patents. This suit was filed subsequent to the time when both of these patents expired.

In view of what we have heretofore held as to the failure of proof concerning notice, it would appear unnecessary to discuss infringement of these two patents for the reason that plaintiff in any event would not be entitled to recover. We have, however, considered defendant's contention that plaintiff has failed in proving infringement during the pertinent period. We think defendant's contention in this respect must be sustained. Plaintiff relies upon a single sale as proof of the infringement of patent No. 1,328,459. This sale was made by the S. S. White Manufacturing Company in Los Angeles in 1936. Assuming that the article of this sale was manufactured by the defendant, there is no proof that it was made, used or sold by the defendant subsequent to the expiration of the license agreements. For ought shown by the record, the article could have been manufactured during the period defendant was protected by the license agreements. The only other proof relied upon by the plaintiff to show infringement as to either of these patents is certain advertisements which appeared in catalogs published by the defendant wherein such alleged infringing articles were offered for sale. These patents having expired, no question exists as to the right of plaintiff to an injunction, and we think such proof is immaterial to the charge of infringement, or at any rate is insufficient to substantiate such charge. We agree with the decision in Van Kannell Revolving Door Co. v. Revolving Door & Fixture Co., D.C., 293 F. 261, that such is the law.

Patent No. 1,718,602, entitled a "Syringe Construction," was issued to the plaintiff June 25, 1929. The patent device is a syringe used by dentists in administering an anesthetic to a patient preparatory to a nerve blocking operation. As described

154

by plaintiff, it has a barrel with an open top to receive an ampule. The ampule contains liquid to be dispensed by the syringe. The lower end of the inserted ampule extends to the tapered smaller open bottom of the barrel. The barrel has a closure for closing the open upper end of the barrel. This closure has a member which extends into the barrel for positioning the inserted ampule. When the syringe is in closed position the screw threads of the barrel and the positioning member interengage, and the ampule is pressed downwardly so that a resilient collar on the lower end of the ampule bears against the inner walls of the tapered lower end of the barrel and forms a fluid-tight engagement therewith.

■■■ The lower court found the patent valid and claim 7, the only one in suit, infringed. Defendant argues invalidity and non-infringement. After a study of defendant's brief and argument, it is not unfair to state, so we think, that it is not so insistent on the defense of invalidity but strongly urges non-infringement. In support of its argument as to invalidity, it relies on three prior art patents: De Backer, a German patent, No. 79,164, issued January 23, 1895, entitled a "Syringe"; Slater No. 486,057, issued November 8, 1892, entitled "Hypodermic Syringe"; and Payne No. 1,012,700, issued December 26, 1911, entitled a "Syringe." Defendant concedes that the instant patent is not anticipated by any of the prior art; in fact, they were not pleaded and at the time of their introduction in evidence, defendant's counsel expressly stated that they were not offered for such purpose but offered merely to show the state of the art. Plaintiff contends that they are not properly before the court for any purpose and cites some authorities which have so held. However, this court in the recent case of Oswell v. Bloomfield et al., 7 Cir., 113 F.2d 377, 378, expressly held that "proof of the state of the art is always admissible to show want of invention regardless of whether or not that defense is pleaded."

■■■ We are of the view that no good purpose could be served in an analysis of these prior art patents as bearing upon the question of invention. It is sufficient, so we think, to state that we have examined and studied them and are not prepared to hold that the presumption of validity which attached to the patent grant has been overcome. We therefore hold the patent valid, and turn to the more controversial question of infringement.

Claim 7 in suit reads: "A syringe comprising a barrel, an ampule in said barrel, means to make a fluid tight connection between the ampule and one end of the barrel, a closure including an ampule positioning member freely movable within said barrel, *means on said barrel and member to hold said member against said ampule in adjusted position to maintain said* fluid tight engagement."

The italicized portion of the claim furnishes the main controversy between the parties. Defendant contends that the element thus called for is not found on the accused device, while plaintiff argues to the contrary. There is some dispute as to the exact meaning of the phrase in question. Undoubtedly, the prior art discloses the means for ejecting the anesthetic from the ampule to and through a needle and into the patient. The instant patentee, however, expressly stated as a purpose of his invention, "a hypodermic syringe which is adapted to receive an ampule either for ejection of the drug contained in the ampule or for the injection of a substance into the ampule." We are inclined to agree with the defendant that it is the injection provision which must be relied upon to give this patent an inventive standing over the prior art. By injection is meant the withdrawing of a fluid such as blood from the patient into the ampule, in contrast to ejecting a fluid from the ampule into the patient.

Furthermore, the patentee relates as another object of his invention "to provide a syringe having novel means for centering and locking an ampule therein to form a fluid tight seal between the syringe and the ampule." It is defendant's contention that the language of the claim which we have italicized relates to the locking means which the patentee described as one of the objects of his invention. As we have stated, we think this construction must be accepted; otherwise, the claim would disclose no invention over the prior art. This is the important feature of the invention, without which it would not perform the dual purpose described. The locking means which the patentee describes is accomplished by threads on the inside of the barrel of the syringe in which the ampule is located. The lower telescopic member, through which the plunger operates, is provided with a threaded head designed to

engage the internal threads of the barrel. Thus, the ampule is held in a stationary position when the rubber stopper of the ampule is withdrawn so as to permit the injection of fluid from the patient into the ampule.

While plaintiff urgently insists that the accused devices infringe, he has not, in our opinion, shown that defendant has this locking element. A number of the accused devices were introduced in evidence, and it is plain from their inspection that no such locking element is utilized. In fact, there is no occasion for defendant to employ such element, as its syringe only purports to be a one-purpose syringe, that is, an ejecting in contrast to an injecting syringe. Plaintiff undertakes to read the elements found in the claim in suit upon defendant's construction, as disclosed in a pamphlet packed in connection with defendant's syringe. We have no difficulty in reading on defendant's structure, as exemplified in this pamphlet, all the elements of the claim in suit except the one in dispute. Plaintiff argues that this element reads upon the following description in defendant's pamphlet: "The screw threads on the barrel are adapted to engage the screw threads on the top telescopic segment." It is obvious, however, that this description has nothing to do with the locking means called for in the claim.

Inasmuch as we think this locking element was essential in order to constitute invention over the prior art, we think it follows that defendant's device which omits such element does not infringe. We therefore hold that defendant has not infringed this claim.

Reissue Pat. No. 17,906, issued December 16, 1930, entitled "Hypodermic Syringe" refers to a syringe of the same general type as the one described in the patent lastly discussed. Claims 1, 2, 10 to 18, inclusive, 26, 27 and 28, in suit, were found valid and infringed.

Here again we have difficulty in ascertaining the improvement relied upon as constituting invention. Two purposes stated in the specifications appear to furnish the only basis for the patentee's contention in this respect: (1) "It is a further object of the invention to provide a syringe * * * adapted to form the necessary fluid tight joint between the ampules and the syringe, with facility and dispatch and with very little trouble upon the part of the user" and (2) "One of the most important features of the present invention is the provision of the yielding sleeve 24. This construction renders it possible to handle ampules of varying sizes and consequently of varying cubic capacities." As to the latter function, the specification further states: " * * * it is clear from the construction illustrated and described that the yielding sleeve 24 will serve to preliminarily establish a fluid tight joint between the needle and the ampule, irrespective of the length of the ampule * * *."

The parties in their briefs have treated the 14 claims involved in two groups as follows: (1) Claims 1, 2, 10, 12, 17, 18 and 26, and (2) 11, 14, 15, 16, 27 and 28. Claim 13 has been treated separately. All the claims of group (1) refer to a syringe while those in group (2) refer to a syringe in combination with an ampule. All the claims of both groups in varying phraseology call for a means in the discharge end (the tapered front end) of the syringe for making a fluid tight connection between the syringe and the ampule when the latter is inserted in operable position. Plaintiff treats claim 17 as typical of group (1) and claim 27 as typical of group (2). The former requires a "means at its discharge end to make fluid tight connection directly with the forward end of the body of the ampule." The latter sets forth "a rubber packing element fitted in said tapered portion, said packing element being flared at its upper end and having an aperture therethrough, and an ampule in said barrel, said ampule having a tapered lower end fitting the flared portion of said packing element."

All the claims in suit also in one form or another call for a yielding member, that is, a spring which surrounds and operates in conjunction with a plunger rod which bears against the rear or upper end of the ampule. Thus the ampule is held firmly in position and the pressure at the upper end results in a closer fit between the lower end of the ampule and its contact member at that point. This yielding element is plainly disclosed by Payne No. 1,012,700 where it is described as a "spring bearing at one end on a shoulder within the casing, and at the other end on a shoulder on the guide and being adapted to press the guide toward the barrel." (The word barrel used by Payne means the

same as the word ampule used by Smith.) In his drawings he shows this spring pressed member engaging the rear of the ampule as does the instant patentee. Of course Payne's construction differs in some respects. For instance, he provides for insertion of the ampule at the sides of the syringe rather than at the end, but how this could make any difference in the function served by this yielding member we are unable to discern. Neither do we see how it furnishes any support to the claimed invention.

Therefore, we are of the view that the validity of the claims in suit must rest upon the alleged improvement in disclosing a means for making a fluid tight connection between the forward end of the ampule and its contacting member. Defendant contends that at least some of the claims are invalid for failure to describe the means thus called for. While we think a claim must specify the elements relied upon, we do not understand that it is incumbent on the patentee to describe each element in detail. Reference to the specifications and drawings may be resorted to for such detailed construction.

Defendant also contends that the old and well known expedient of making a fluid tight connection between two containers carrying a liquid could not amount to invention. This would seem to be so as a general proposition. Plaintiff asserts, however, that the means disclosed constituted a remarkable advance in the art. It appears pertinent to note the description of this alleged improvement as shown in the specifications. It states: "This head (syringe head) is provided with a conical chamber and this chamber in turn receives a thin metal funnel which constitutes a seating for a conical rubber packing element. * * * The rubber cone is provided with a convex upper face and has a central tapering depression formed in said upper face which receives the lower end of the ampule after the tip has been broken off."

That this type of sealing means has many advantages is not denied by defendant. We are satisfied it is not disclosed in the prior art. Whether it comes within the realm of invention or belongs in that of a skilled mechanic is not free from doubt. However, we are not convinced that the presumption attached to the grant has been overcome and we sustain the validity of these claims.

Claim 13 contains no requirement as to a sealing means. It calls for a yielding member as do all the other claims. As already noted, we think there is no patentable improvement in such an element. We hold this claim invalid.

Here again the more serious question is that of infringement. Defendant's syringe is not provided with a sealing means at its discharge end. Its sealing means is in the form of a rubber band attached to the point of the ampule. While this sealing means differs in form from that disclosed by the patentee, it does, so we think, accomplish substantially the same result when the ampule is inserted and is in operable position.

Plaintiff devotes much of his argument attempting to demonstrate that the claims in suit read upon defendant's device, but always upon the combination rather than the syringe and ampule as separate entities.

As already pointed out, the claims of both groups (1) and (2) definitely call for a sealing member at the tip of the syringe, and the specifications and drawings demonstrate a particular type of means inserted in such tip and fixed thereto. It is true that the claims of group (2) call for a combination of the syringe and ampule, but the sealing means, nevertheless, is an element of the syringe and not the ampule. We have serious doubt that the so-called combination claims add anything to the patentee's monopoly. Certainly there was nothing novel about an ampule, and its use with a syringe was a well-known practice. In fact, neither plaintiff's nor defendant's syringe would have any utility except when employed in connection with an ampule.

Defendant contends that an ampule is a functional device not subject to patent. We think this is correct. (See our discussion of Design Patent No. 101,485, supra.) We note however that one of the patents included in the complaint was upon an "ampule." This patent, for some reason not disclosed by the record, was abandoned by the plaintiff. But even though the ampule is not merely a functional device, it is certain that it is a replacement part while the syringe proper is capable of long and continuous use.

We are of the view that the claims in suit must be narrowly construed and that the patentee must be held to that which he has specifically described and

illustrated as his inventive improvement. Certainly his claims do not read upon defendant's syringe for the reason that it has no sealing member fixed thereto. It appears equally certain that the patentee acquired no monopoly upon the ampule. The decisive question appears to be whether the patentee's grant should be extended to include an ampule in combination with a syringe. We think the question must be answered in the negative. To do otherwise would broaden the patentee's protection to include this replaceable ampule which is not a part of his invention. As was said in Morton Salt Co. v. Suppiger Co., 314 U.S. 488, 492, 62 S.Ct. 402, 405, 86 L.Ed. 363: "But the public policy which includes inventions within the granted monopoly excludes from it all that is not embraced in the invention."

Also in Carbice Corp. v. Amer. Patents Development Corp., 283 U.S. 27, 33, 51 S.Ct. 334, 336, 75 L.Ed. 819, the court made this pertinent observation: "Control over the supply of such unpatented material is beyond the scope of the patentee's monopoly; and this limitation, inherent in the patent grant, is not dependent upon the peculiar function or character of the unpatented material or on the way in which it is used."

Defendant also contends that the patentee is estopped to assert the broad protection now claimed. This argument is based upon an interference proceeding between patentee and one Nevins. The only thing contained in the record concerning this interference is the decision of the Examiner. We doubt if the record is sufficiently complete to make a decision as to estoppel. Moreover, we think it is not necessary. It is pertinent to observe, however, that it appears from the Examiner's decision that the patentee attempted to broaden his protection to include a packing member, irrespective of its location. His proposals in this respect were not allowed and his claims were limited to a packing element or seal definitely situated in the tip of the syringe. We mention this incident only because it supports, so we think, our conclusion that the claims must be narrowly construed and limited strictly to that which is stated therein.

We therefore conclude that neither defendant's syringe nor ampule, either separately or in combination, infringes the claims of this patent.

The decree appealed from is reversed and remanded with directions to enter a decree in conformity with the views expressed herein, costs to be taxed equally as between the plaintiff and corporate defendant.