**PHILIP MORRIS, INCORPORATED,**
Plaintiff,

v.

**The IMPERIAL TOBACCO COMPANY (OF GREAT BRITAIN AND IRELAND), LIMITED, Defendant.**

Civ. A. No. 3628.

United States District Court
E. D. Virginia,
Richmond Division.

Dec. 27, 1965.

©—65

---

Lewis T. Booker, Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., Leslie D. Taggart, Nicholas John Stathis, Herbert Blecker, Watson, Leavenworth, Kelton & Taggart, New York City, for plaintiff.

Charles L. Reed, Tucker, Mays, Moore & Reed, Richmond, Va., W. Brown Morton, Jr., J. T. Martin, McLean, Morton & Boustead, Washington, D. C., for defendant.

BUTZNER, District Judge.

Philip Morris, Incorporated, brought this action against The Imperial Tobacco Company (of Great Britain and Ireland), Limited, alleging trademark infringement and unfair competition. The complaint seeks an injunction, damages and declaratory relief.

Imperial answered and asserted a counterclaim for declaratory relief, assignment of trademark registrations and an injunction against harassment of its distributors.

Jurisdiction of the Court is not questioned. It rests upon diversity of citizenship and the fact that the amount in controversy exceeds $10,000, exclusive of interest and costs. It also rests upon 28 U.S.C. § 1338 and 15 U.S.C. § 1051 et seq.

Both Philip Morris and Imperial manufacture and sell cigarettes and other tobacco products. Philip Morris claims the exclusive right to use the word PLAYER'S and a device consisting of a sailor head inside a life buoy on packages of tobacco products in the United States. It contends that the use of PLAYER'S by Imperial in the United States infringes its rights and should be prohibited.

Imperial admits that it has no right to use the composite expression "PLAYER'S Navy Cut" and the sailor head device on any of its products in the United States. It says that the right to use "PLAYER'S Navy Cut" and the devise is under exclusive but restricted license to Philip Morris, perpetual unless breached.

Imperial claims, however, that it has the right to use in the United States the word PLAYER'S or PLAYER, providing it does not join the words "Navy Cut" and the sailor head device. Imperial sells in the United States cigarettes and other products which bear the trademark PLAYER'S.

The primary issue in the case is the determination of the rights of the parties to the word "PLAYER'S" in the United States.

The controversy turns primarily on the question of whether Philip Morris is a licensee of Imperial. Imperial's position depends on interpreting the opinion, decree and other proceedings in United States v. American Tobacco Company, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911) as continuing a license created by agreement between Imperial and American Tobacco Company.

The Court concludes that the antitrust proceedings brought by the United States against American Tobacco Company and other defendants terminated the agreement made by the tobacco companies. Consequently, Philip Morris is not a

licensee of Imperial. It has the right to use PLAYER'S as a trademark for the sale of tobacco products. The Court further concludes that Philip Morris' right to use PLAYER'S is not limited to its use in conjunction with the words "Navy Cut".

The Court also concludes that Imperial is not entitled to use the trademark PLAYER'S in the United States and that its use of this trademark has infringed upon Philip Morris' rights. Imperial is not entitled to judgment upon its counterclaim.

Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court states its findings of fact and conclusions of law.

## FINDINGS OF FACT

### I.

1. Plaintiff, Philip Morris, Incorporated, is a Virginia corporation, which, along with a related company, will be referred to as Philip Morris.

2. Defendant, The Imperial Tobacco Company (of Great Britain and Ireland), Limited, is a British corporation, whose registered office is located in Bristol, England. It has been qualified to do business in Virginia since August 8, 1903. The defendant and its predecessors will be referred to as Imperial.

3. John Player & Sons Limited was a British company dealing in cigarettes, smoking tobaccos and other tobacco products predominantly in Great Britain. On December 10, 1901 its entire business was taken over by the John Player & Sons branch of Imperial and has been continued as such to the present time.

4. The British-American Tobacco Company (B.A.T.) was founded by American and Imperial in 1901. Various foreign rights were given to it. It owns PLAYER'S throughout the world except in the United Kingdom, Ireland and the United States. The Supreme Court required American to divest itself of B.A.T. stock in 1911, but Imperial has continued to be a substantial stockholder. Imperial does not control B.A.T. The president and chairman of Imperial are directors of B.A.T., and Imperial and B.A.T. are in joint ventures and work closely together.

5. On September 27, 1902, Imperial and American Tobacco Company (which will be called American) together with several other companies, entered into two written agreements known as the Ogden Agreement and the British-American Tobacco Company agreement. These agreements divided the world into exclusive territories for the manufacture and sale of tobacco products. Imperial agreed to limit its selling activities to the United Kingdom and American agreed to limit its activities to the United States, its dependencies and Cuba. The language of the Ogden Agreement pertinent to this proceeding appears in paragraph 19 and reads:

"* * * The Imperial Company shall be empowered by the American Company and the Continental Company to manufacture their brands within the United Kingdom for sale therein, and the American Company, the Continental Company, and the Cigar Company shall be empowered to manufacture the brands of the Imperial Company in the United States for sale therein, and each party shall manufacture the brands of the other party upon recipes and formulae to be supplied by the other."

6. In 1911, the Supreme Court held that the Ogden Agreement of September 27, 1902 violated the antitrust laws, United States v. American Tobacco Company, 221 U.S. 106, 181, 31 S.Ct. 632 (1911). The Supreme Court remanded the case with directions to the court below to enter a decree in conformity with the opinion of the Supreme Court. Further proceedings are reported in United States v. American Tobacco Company, 191 F. 371 (C.C.S.D.N.Y.1911). The proposal of the American Tobacco Company and others (but not Imperial) for the abrogation of foreign restrictive covenants is found at 191 F. 398.

The Circuit Court's decree contains the following pertinent provisions, 191 F. 418:

"B. *Abrogation of Foreign Restrictive Covenants.*

"Under the contracts of September 27, 1902, the Imperial Tobacco Company (of Great Britain and Ireland), Limited, and certain of its directors agreed not to engage in the business of manufacturing or selling tobacco in the United States, the American Tobacco Company and American Cigar Company and certain of their directors agreed not to engage in the business of manufacturing or selling tobacco in Great Britain and Ireland, and the American Tobacco Company, American Cigar Company, and the Imperial Tobacco Company agreed not to engage in the business of manufacturing or selling tobacco in countries other than Great Britain and Ireland and the United States. Under the provisions of these contracts British-American Tobacco Company, Limited, was organized and took over the export businesses of the American Tobacco Company and the Imperial Tobacco Company, with factories, materials, and supplies.

"It is proposed that the covenants herein just described, as well as all covenants restricting the rights of any company or individual in the combination to buy, manufacture, or sell tobacco or its products, be rescinded by the affirmative action of the respective parties thereto who are parties to this suit, except such of said covenants, whether or not contained in the contracts of September 27, 1902, as (a) relate wholly to business in foreign countries, and are covenants the benefit whereof has been assigned or transferred to other parties, or (b) are covenants exclusively between foreign corporations and relating wholly to business in or between foreign countries, and that the said contracts of September 27, 1902, be altogether terminated so far as they impose any obligations upon any of the parties thereto to furnish or to refrain from furnishing manufactured tobaccos to any party, each company to treat as its own, but only to the extent provided for in said contracts, all brands and trade-marks which by said contracts it was given the right to manufacture and sell, the said rights having been perpetual and constituting in effect a conveyance of the brands and trade-marks used for the countries in which they were so used by each of said companies as aforesaid."

7. Imperial executed a document dated January 30, 1912 in accordance with the provisions of the 1911 decree. The document provides, in part:

"NOW these presents witness:

"That the said The Imperial Tobacco Company (of Great Britain and Ireland) Limited subject as hereinafter mentioned hereby rescinds the said covenants as well as all covenants restricting the right of any Company or individual in the combination as mentioned in the said decree to buy manufacture or sell tobacco or its products and that said contracts of September 27, 1902 be altogether terminated so far as they impose any obligations upon any of the parties thereto to furnish or to refrain from furnishing manufactured tobaccos to any party always excepting however such of said covenants whether or not contained in the contracts of September 27, 1902 as

"(a) Relate wholly to business in foreign countries and are covenants the benefit whereof has been assigned or transferred to other parties, or

"(b) Are covenants exclusively between foreign corporations and relating wholly to business in or between foreign countries

"Provided always that these presents shall apply only to trade and commerce in or between the several states or territories of the United States or the District of Columbia,

and trade and commerce between the United States and foreign nations.

"And the said the Imperial Tobacco Company (of Great Britain and Ireland) Limited hereby releases each of said Companies and each of the individuals hereinbefore named from any and all obligations under said covenants except as hereinbefore provided."

8. On September 30, 1912, American wrote Imperial:

"In compliance with the request contained in your letter of the 18th of September we enclose herewith list of your company's brands, which under the terms of the decree of the disintegration of the American Tobacco Company, we consider as belonging to us for this country."

The list was for tobaccos and included Players N.C. and Players Mixture. On October 8, 1912, American wrote Imperial that it had neglected to take into account cigarette brands. The letter stated, in part:

"We enclose herewith a list of those brands which we have imported in the past and which we consider now as belonging to us for this country."

Among the cigarettes listed was Players N.C.

9. Between January 30, 1912 and March 21, 1913, various branches of Imperial shipped products to the United States and Imperial sent a royalty check to American, which American returned on March 21, 1913 to Imperial, saying:

"We do not feel justified in accepting this check, and are herewith returning it. We are advised that the decree of November 16, 1911, of which you have a copy, terminated the contract of September 27, 1902, in so far as that contract was executory, leaving us owning in the United States the brands which during the license of the contract, we had imported. You are under no obligation to make us payment on any brand not owned by us, because you

are free to sell such brand to anyone in the United States without any accounting to or payment to us. So far as the brands of yours that we own in the United States, we think that you should not make shipments except upon our order. Some of the brands shown on this statement are of one class, and some are of the other. As to the brands which we own, we realize that under the circumstances your shipment of them was an entirely excusable and inadvertent infringement of our rights, which we do not desire to in any way penalize, and we prefer not accepting any part of the profits which you received."

Imperial acquiesced in writing to the position taken by American. A memorandum was drafted by an official of Imperial, which stated:

"In the past orders received from the American Tobacco Company for the supply of the Imperial Tobacco Company's brands have been executed under the terms of the Ogden Agreement, the price charged being based on cost, plus 10%.

"Orders for the supply of Imperial Company's brands in the United States received from persons other than the American Tobacco Co have been executed under the terms of a special permission granted by the American Tobacco Company on the 1st August 1907. One of the terms of this special permission is that the American Tobacco Co are to be notified of all shipments made under it and are to receive the price obtained less actual cost plus 5%.

"In pursuance of the terms of this special permission the Chief Accountant made a return to the A.T. Co on the 7th March, 1913 showing a sum of £12. 6. 4 due to them for which a cheque was sent. On the 21st March 1913 the A. T. Co. returned the cheque stating that they were unable to execute it and they referred to the decree. They make

no reference to the special permission.

"The Committee at their last meeting decided not to execute orders received from the United States for any of the brands claimed by the A. T. Co, and I was instructed to draft a circular to the Branches for submission to this meeting.

"The following questions should be determined before the circular is drafted.

"1. Is the special permission of 1907 to be looked upon as revoked.

"2. If the special permission is not to be looked upon as revoked then

"(a) Do we intend to execute orders under it notwithstanding the refusal of the A. T. Co to accept payment of their portion of the profit

"(b) How is the A. T. Co's portion of the profit to be dealt with?

"3. If the special permission is to be looked upon as revoked

"(a) Do we intend to execute orders from the U. S. A. for brands other than those claimed by the A. T. Co (The Committee have already decided not to execute orders for brands claimed by the A. T. Co.)?

"(b) If orders for the U. S. A. are to be executed for brands other than those claimed by the A. T. Co. do the Committee wish to fix any basis upon which the prices to be charged for such goods is to be calculated?

"4. Is there any intention to maintain the spirit of the Ogden agreement?"

10. American's assertion of ownership, however, was not consistently maintained. Thus, on August 21, 1922, American wrote Imperial, referring to " * * brands which as to this country we have the license of September 1902 from you, confirmed by the decree of the court of 1911. * * *"

11. By agreement dated July 7, 1922, American granted Philip Morris an option to acquire before May 1, 1925 American's business in certain areas " * * * under any or all of the brands, trademarks and tradenames mentioned and described in Schedule B hereto annexed * * *." Schedule B included among the tobaccos Players N.C. and Players Navy Mixt., and among the cigarettes Players N.C.

On June 21, 1926 American and Philip Morris entered into an agreement which abrogated the contract of July 7, 1922 and by which American undertook to " * * * convey to Philip Morris-International Corporation the brand 'Player's' listed in 'Schedule B' of said contract of July 7, 1922, but none of the other brands listed in said 'Schedule B'." Philip Morris undertook to employ American to manufacture and supply " * * * all of its cigarettes and other tobacco products of the brand 'Player's' subject to the control and supervision of Philip Morris-International Corporation."

The agreement further provided: "Wrapping material is to be ordered by The American Tobacco Company but orders are first to be submitted to Philip Morris-International Corporation for approval * * *."

On June 28, 1926 American executed a paper stating that it:

"does sell, assign, transfer and set over unto PHILIP MORRIS-INTERNATIONAL CORPORATION, * * *, the brand of cigarettes and other tobacco products known as 'Player's' or 'Player's Navy Cut' or 'Player's N.C.', and the business in connection therewith together with the good will thereof, recipes, processes and formulae, for the United States of America and dependencies thereof (except the Panama Canal Zone) and also the Republic of Cuba, and the exclusive right thereto; TO HAVE AND TO HOLD the foregoing property unto Philip Morris-International Corporation, its successors and assigns absolutely and forever."

There were no encumbrances or restrictions in this paper. The paper did not purport to be, and was not the assignment or transfer of a license. Prior authority for the sale was neither sought nor obtained from Imperial.

12. American continued, as it had since 1922, to manufacture PLAYER'S Medium Navy Cut cigarettes in the United States for Philip Morris until February 1, 1945.

On December 28, 1944 American wrote Philip Morris:

" * * * we no longer desire to manufacture for and supply to you cigarettes and other tobacco products of the brand 'Player's,' which we have heretofore been manufacturing and supplying to you pursuant to the provisions of the agreement between The American Tobacco Company and Philip Morris International Corporation dated June 21, 1926, and we hereby elect to terminate and do hereby terminate the arrangement between us for our manufacture and supply to you of cigarettes and other tobacco products of the brand 'Player's'; * * *.

"We would be pleased to turn over to you at book value wrapping materials of the 'Player's' brand now on hand, and which we have acquired in connection with the manufacture and supply of the above-mentioned cigarettes and tobacco products."

13. About February 14, 1945 Philip Morris started to sell PLAYER'S cigarettes of its own manufacture in the United States.

The front of the shell of its cigarette package bears the design of a sailor head inside a life buoy against a seascape background. The life buoy is labeled "PLAYER'S NAVY CUT". Above the design is the legend "MADE IN U.S.A." and below it "CIGARETTES 'MEDIUM'." The back of the shell bears the Nottingham Castle mark and the legend:

"Manufactured from

RICH, COOL
VIRGINIA TOBACCO

Established by
John Player & Sons.

Manufactured in the United States by Philip Morris Incorporated, New York"

The ends of the shell bear the legends:

"John Player & Sons.
20 CLASS A CIGARETTES"

and:

"Established by
John Player & Sons.
PHILIP MORRIS INC., NEW YORK
PERMIT NO. TP-7 VIRGINIA"

The slide contains the legend:

"PLAYER'S
'MEDIUM' NAVY CUT

These cigarettes are made from the FINEST TOBACCOS, and will be found rich and cool in smoking."

followed by the sailor head device and the legend:

"EACH CIGARETTE IS STAMPED
PLAYER'S
'MEDIUM' NAVY CUT"

Underneath the reproduction of the sailor head device are the words "TRADE MARK".

Cartons of these cigarettes marketed by Philip Morris have on the top and each end the sailor head device and the legend "PLAYERS CIGARETTES MEDIUM NAVY CUT". The same legend without the sailor head device appears on the front and back of the carton. The largest print is used for the word "PLAYERS". It is the dominant word.

14. Since 1945 Philip Morris has continuously manufactured and sold PLAYER'S Medium Navy Cut cigarettes in the United States in appreciable quantities. From 1945 through 1963 annual sales varied from a maximum of over 30,000,000 to a minimum of approximately 11,000,000.


15. Imperial's sales in the United States were not large until 1957. Prior to September 1902, John Player & Sons, Limited, sold tobacco products in the United States bearing the word PLAYER'S. These sales were so small and insignificant that a senior official of the firm was not aware of them.

From 1902 to 1911, Imperial sold no Player's products in the United States to the trade and public. It supplied PLAYER'S Navy Cut tobacco and cigarettes, Mild or Medium, and PLAYER'S Mixture tobacco to American, which American sold in the United States during that period.

During the period from 1912 to 1926, Imperial's sale of Player's products in the United States was very small. It sold a small amount of tobacco and cigarettes to American.

During the period from June 1926 to the end of 1944, Imperial sold 46 pounds of PLAYER'S NO NAME tobacco and a quarter of a pound of PLAYER'S COUNTRY LIFE MIXTURE to the trade and private individuals as well as a thousand PLAYER'S GOLD LEAF NAVY CUT cigarettes. Sales to American were small; the largest amount of tobacco in any single year did not exceed 300 pounds and never did the cigarettes exceed 51,000.

From 1945 to the end of 1956 Imperial sold to the trade and public in the United States (other than sales made with Philip Morris' permission to the British armed forces and embassy in the United States) about 143,000 PLAYER'S cigarettes and 334 pounds of PLAYER'S tobacco. No significant amount of these sales consisted of PLAYER'S Navy Cut cigarettes or tobacco.

In 1957 Imperial sold PLAYER'S products in the United States in larger quantities, and in 1958 Philip Morris protested the sales as prejudicial to its trademark PLAYER'S.

16. Neither party has advertised PLAYER'S cigarettes or other tobacco products in the United States. Imperial has advertised them extensively in the United Kingdom and on transatlantic vessels. Several novels which have been widely read in the United States mentioned PLAYER'S cigarettes in a context that identified them as English cigarettes.

In proceedings styled Philip Morris & Co., Ltd., 32 F.T.C. 278 (1940), the Federal Trade Commission ordered Philip Morris to cease and desist from "using the name 'Player's Navy Cut' as a designation of any cigarette not manufactured in England, unless in immediate connection with such name the country of manufacture of said cigarettes is set forth in letters of the same size or conspicuousness as is the trade name 'Player's Navy Cut'."

Philip Morris has sold many millions of PLAYER'S cigarettes designating Philip Morris as the manufacturer and stating that the cigarettes are made in the United States. The *Western Tobacconist* which lists all cigarettes and tobacco brands and the name of the manufacturer from whom they can be purchased, indicates that the origin for PLAYER'S in the United States is Philip Morris.

Undoubtedly, PLAYER'S is considered an English type cigarette by those members of the United States public who have given it any thought. The evidence, however, fails to establish that, after the order of the Federal Trade Commission, the United States public believed PLAYER'S cigarettes, sold by Philip Morris in the United States, were manufactured in England by Imperial or the John Player & Sons branch of Imperial.

II.

17. The word PLAYER'S is a means of identifying and distinguishing cigarettes and smoking tobacco, including products which were navy cut, from cigarettes and tobacco products with different words and terms on them. The term "Navy Cut" is descriptive of tobacco and is not a brand or trademark.

18. On February 20, 1888, "PLAYER" was registered in the British Patent Office as a trademark of Imperial's predecessor, the firm trading as John Player.

Registration 73771 was for "manufactured tobacco except snuff". Registration was effected under a special provision of the 1883 British Patents Design and Trademarks Act, which allowed registration of any distinctive word used as a trademark before August 13, 1875. Imperial's predecessor claimed use of "PLAYER" as a trademark for thirteen years prior thereto "and in respect of cigarettes for about one year prior to 15th August, 1875". Imperial succeeded to the registration prior to 1902. This British registration was still in effect in the summer of 1964.

19. In British registration No. 152070, issued to the firm trading as John Player, Castle Tobacco Factory, Nottingham, November 17, 1890, for cigarettes, the statement from the application provides, in part:

"The essential particulars of the trademark are the following: the device of 'Castle' and 'Nottingham Castle' and the Applicants disclaim any right to the exclusive use of the added matter except 'Players', the words 'Gold Leaf' and 'Navy Cut' being common to the trade."

The disclaimer of "navy cut" was confirmed by the High Court of Justice, Chancery Division, by Mr. Justice Cozens-Hardy, In the matter of John Player & Sons' Application for a Trade Mark, 18 R.Pat.Cas. 65 (1900).

20. A United States registered trademark No. 37–158 for smoking tobacco, chewing tobacco, cigars, cigaroots, cigarettes and snuff, registered October 1, 1901 by John Player & Sons, Ltd., provided, in part, in the applicant's statement:

"Said trade-mark consists of a life-buoy. This has generally been arranged as shown in the accompanying facsimile. On the life-buoy are the words 'Players Navy Cut' in plain block type. The wording may be omitted or varied without materially altering the character of the trade-mark, the essential feature of which is the representation of a life-buoy."

21. John Player & Sons branch of Imperial manufactured and sold smoking tobaccos and cigarettes in the United Kingdom in which the cut of tobacco was different and of which fact Imperial informed the trade and the public on the label of the product. The guard book of the John Player & Sons branch of Imperial lists some of these different cuts:

| Trademark/Brand | Cut | Type of Tobacco | Page in Guard Book |
| --- | --- | --- | --- |
| Arnotte's | straight cut | | 705 |
| PLAYER'S | navy cut | | 400/401 |
| Canby's | straight cut | | 717 |
| Canby's | colony cut | | 943 |
| Thompson | Chester cut | | 864 |
| PLAYER'S | Chester cut | | 335 |
| ELMER'S | course cut | Cavendish | 745 |
| ELMER'S | fine cut | Cavendish | 746 |
| Jay's | special straight cut | | 785 |
| La Careja | finest flake cut | Cavendish | 783/4 |
| PLAYER'S | silk cut | | 598 |
| PLAYER'S | army cut | | 1037 |

John Player & Sons branch of Imperial used the term "navy cut" in the United Kingdom on a considerable number of smoking tobaccos and cigarettes which were sold directly or were made up by others as private brands. The labels for such products showing the trademark or brands are shown in the "Guard Book" of John Player & Sons branch of Imperial, and include:

| Trademark/Brand | Goods | Type of Tobacco | Page in Guard Book |
|---|---|---|---|
| PLAYER'S | navy cut | | 400/401 |
| BRAILSFORD'S MERMAID | navy cut | | 709 |
| CROWN-HIGGS | navy cut | | 757 |
| W. H. YORKE | navy cut | | 897 |
| A. TORRANCE'S | navy cut cigarettes | | 867 |
| THE SQUADRON | navy cut cigarettes | | 944/5 |
| LEWENS' OLD TOWER | navy cut | | 797/8 |
| PLAYER'S | navy cut | full | 1059/912 |
| PLAYER'S | navy cut | tawny | 1078 |
| PLAYER'S | navy cut | de luxe | 1091 1145 |
| PLAYER'S | navy cut | mild | 1104 |
| PLAYER'S | navy cut | gold leaf | 651 1120 1160 1162 |
| PLAYER'S | navy cut | medium | 1058 |
| SALSBURY'S | navy cut | selected | 845 |

The "Guard Book" contained only the labels of the John Player & Sons branch. Imperial's use of other brands of navy cut products such as "CAPSTAN navy cut cigarettes" does not appear therein.

22. Imperial has demonstrated by its own packages manufactured and sold in the United Kingdom that navy cut is descriptive of tobacco. Imperial's label for PLAYER'S Navy Cut Medium with the sailor head device against the seascape and the Nottingham Castle device as approved by its Trade Marks Department March 10, 1958, carries this information:

"These High-class Cigarettes are manufactured from the finest Navy Cut Tobacco, and are absolutely free from adulterations.

---

"This tin (containing 50 Cigarettes) is easily opened and being air-tight preserves the contents in perfect condition.

---

JOHN PLAYER & SONS.
Nottingham

---

"This label is issued by the Imperial Tobacco Company (of Great Britain & Ireland), Limited."

23. Various navy cut products are sold in the United States in addition to PLAYER'S; for example, CAPSTAN NAVY CUT MEDIUM TOBACCO, which is an Imperial product, Wavy Navy Cut Tobacco, and PREMIER'S MEDIUM NAVY CUT Cigarettes.

24. Imperial consistently has used PLAYER'S as the prominent feature of its cigarette advertising in the United Kingdom. Its advertising slogans "Player's Please" and "Smoke Player's Cigarettes" advertise products of Imperial's John Player & Sons branch, including Player's Navy Cut Cigarettes.

## III.

25. On November 25, 1901, John Player & Sons, Ltd. registered the representation of a castle and the words "Nott Castle" in the United States, No. 37350. This registration is presently in effect through renewals. The registered mark has been used on substantially all of the products of John Player & Sons' branch of the Imperial sold in the United States. It has also been used by Philip Morris on their packages bearing the word "PLAYER'S".

26. In December 1947, Philip Morris sent Imperial a carton of PLAYER'S cigarettes of Philip Morris' manufacture. On January 27, 1948, Imperial wrote Philip Morris, commenting on differences between Imperial's package and Philip Morris' package. Imperial stated, in part:

"Our Trade Marks Department point out that the Trade Mark numbers 15 4011 and 13 645 are United Kingdom numbers and feel that although it is entirely a matter for you to decide you may like to use simply the words 'Regd. Trade Mark' under the Lifebuoy and on the reverse side above the representation of Nottingham Castle in the oval."

On February 16, 1948, an official of Philip Morris wrote:

"I have taken up with our legal Department your suggestion that we use the words 'Regd. Trademark' on our Players shell (hull). They should like to know if you have the Player's brand registered in the United States and believe, if it has not already been done, that you should do so. We shall then change the shell, removing the numbers and inserting 'Regd. Trade Mark'."

On February 23, 1948, Imperial, in response to Philip Morris' letter of February 16, sent the following memorandum to Philip Morris:

"With reference to the letter from Philip Morris & Co. Ltd., Inc. New York, of the 16th February, there were two registrations of Trade Marks in the United States which concern the Player's 20s Packet. These are:—

| Regd. No. | Date of Regn. | | Mark |
|-----------|------|------|------|
| 37158 | 1. 10. | 1901 | Label consisting of Lifebuoy with words 'Player's Navy Cut' on it. |
| 37350 | 26. 11. | 1901 | Label consisting of Nottingham Castle and certain wording beneath it. |

These United States registrations do not correspond exactly with the English registrations Nos. 154011 and 13645.

"With regard to the first United States Mark No. 37158 a letter was written to Mr. Junius Parker, General Counsel of the American Tobac-

co Company on January 15th, 1926, stating that this registration was in respect of a brand which under the terms of the Decree of the Supreme Court in 1911 became as regards the United States the property of the American Tobacco Company, and adding that the Imperial Tobacco Company did not propose to renew the registration but that if the American Tobacco Company wished to renew it they were at liberty to do so.

"I do not know whether this registration was renewed or not but this should be easily ascertainable from the Register in America.

"The second United States registration No. 37350 was renewed in 1931 by the Imperial Tobacco Company."

27. On January 6, 1951 Philip Morris applied to the United States Patent Office to register PLAYER'S as a trademark for cigarettes. Registration No. 552,831 covering the trademark was issued by the Patent Office on January 1, 1952. An affidavit asserting the requirements set forth in 15 U.S.C. § 1065 was filed on January 22, 1957 and the affidavit was accepted by the Commissioner of Patents. This registration became incontestable on January 22, 1957.

28. On January 6, 1951, Philip Morris applied to the United States Patent Office to register the sailor head device as a trademark for cigarettes. Registration No. 555,064 covering the trademark was issued by the Patent Office to Philip Morris on February 19, 1952. An affidavit asserting the requirements set forth in 15 U.S.C. § 1065 was filed on March 6, 1957 and the affidavit was accepted by the Commissioner of Patents. This registration became incontestable on March 6, 1957. This trademark has been on the packages of PLAYER'S Medium Navy Cut cigarettes sold by American and by Philip Morris.

29. The date of the first issue of each of these trademarks by Philip Morris claimed in the applications which resulted in Registrations No. 552,831 and No. 555,064, namely, February 14, 1945, was the date on which Philip Morris started to manufacture PLAYER'S cigarettes.

30. Both Philip Morris and Imperial believed it was desirable and to the mutual advantage of each that PLAYER'S cigarettes sold in the United States, the United Kingdom and elsewhere throughout the world should be similar. Philip Morris used a blend developed by one of its officers which later was modified in accordance with suggestions from Imperial. Philip Morris and Imperial arranged for an annual exchange of samples so their products would conform. All of this was done on a voluntary, noncompulsory basis. Imperial was satisfied with Philip Morris' product.

At no time during the period 1945 to date has Imperial controlled the nature, quality or packaging of PLAYER'S cigarettes manufactured and sold by Philip Morris in the United States, nor has it made any unequivocal effort to do so.

As recently as December 8, 1961, Imperial, (in an internal communication) referred to its proposed packaging change and stated:

"We discussed the position of Philip Morris in this matter and as neither we nor the B.A.T. Company can give instructions to Philip Morris concerning this design change we felt that the Executive Committee might feel that either we or you from Head Office should write to Philip Morris and advise them that we are making a change in the design of our Medium Navy Cut cartons next year and that the B.A.T. Company are following suit and it may well be that, in order that the change can be world-wide, Philip Morris may also wish to conform."

CONCLUSIONS OF LAW

IV.

Philip Morris contends that it owns the brand of cigarettes and other tobacco products known as PLAYER'S and the trademark PLAYER'S in the United

States. It bases its title on purchase from American of the property acquired by American upon dissolution of the tobacco trust.

Imperial contends that Philip Morris is a licensee of Imperial. It asserts that a license was created by the Ogden agreement and was confirmed by the court in the antitrust proceedings.

On this issue the Court concludes:

■ 1. The opinion of the Supreme Court of the United States in United States v. American Tobacco Company, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663 (1911), the decree implementing the opinion, United States v. American Tobacco Company, 191 F. 371, 417 (C.C. S.D.N.Y.1911), and the document of rescission of the Ogden agreement dated January 30, 1912, all preclude the existence or continuance of any relationship between Imperial and American based upon the Ogden agreement. These papers terminated the relationship between Imperial and American. They neither continued, nor constituted, American a licensee of Imperial. They transferred from Imperial to American the brands and trademarks American had used in the United States.

■ The language of the 1911 decree, "Each company to treat as its own, but only to the extent provided for in said contracts, all brands and trade-marks which by said contracts it was given the right to manufacture and sell, the said rights having been perpetual and constituting in effect a conveyance of the brands and trade-marks used for the countries in which they were so used by each of said companies as aforesaid.",

constituted a termination of the arrangement created by the Ogden agreement, and a transfer of the brands and trademarks to the company which had used them in its territory. The qualifying language "but only to the extent provided for in said contracts" referred to geographical limitations. The Court was conscious of the necessity of excepting foreign business. e. g. United States v. American Tobacco Co., 191 F. 371, 379, 382 (C.C.S.D.N.Y.1911).

No provision in the decree refers to the terms upon which a license was to be held, or control was to be exercised. No reference is made in the decree to any residual rights of Imperial in brands and trademarks transferred to American. These omissions negate the existence of a license.

Imperial retained no residual rights in any brands and trademarks which passed to American under the decree.

Philip Morris is not a licensee of Imperial. Philip Morris owns outright the property it acquired from American.

It may be appropriate to note that this conclusion is consistent with the position taken by American and Imperial in 1913 when American wrote:

"We are advised that the decree of November 16, 1911, of which you have a copy, terminated the contract of September 27, 1902, in so far as that contract was executory, leaving us owning in the United States the brands which during the license of the contract, we had imported."

Imperial implicitly recognized the effect of the 1911 decree by its query "Is there any intention to maintain the spirit of the Ogden agreement?"

The conclusion that Philip Morris is not a licensee of Imperial finds support in the Report of the Attorney General's National Committee to Study the Antitrust Laws, 10 (1955), where, in commenting upon United States v. American Tobacco Company, 221 U.S. 106, 31 S.Ct. 632 (1911), it is observed:

"Remedying this violation, the Court ordered American dissolved in order to recreate 'a new condition which shall be honestly in harmony with and not repugnant to the law.' Such a decree required, in the Circuit Court's view, the division of American into 14 (later 16) corporations, *and prohibiting any connection between these companies and*

*their British rivals.* * * * *"
(Emphasis added)

**V.**

Philip Morris contends that it has the exclusive right to use PLAYER'S on tobacco products in the United States.

Imperial concedes that it may not sell in the United States tobacco products which bear PLAYER'S and the words "Navy Cut", PLAYER'S and the sailor head device, or PLAYER'S and both the words "Navy Cut" and the sailor head device.

Imperial contends, however, that it may sell in the United States any of its brands bearing the trademark PLAYER'S if it does not use the words "Navy Cut" or the sailor head device.

On this issue the Court concludes:

2. Prior to the 1902 contracts between American and Imperial, PLAYER'S was a good and valid trademark in the United Kingdom.

3. The term "Navy Cut" is descriptive of tobacco. It is not a trademark or a brand. It is a term "common to the trade" and was specifically disclaimed by Imperial and its predecessors in registering PLAYER'S as a trademark in the United Kingdom.

P. D. Beckwith, Inc. v. Commissioner of Patents, 252 U.S. 538, 545, 40 S.Ct. 414, 416, 64 L.Ed. 705 (1920) sanctions the disclaimer of descriptive words as a condition to registration of a trademark. The Court said:

"It seems obvious that no one could be deceived as to the scope of such a mark, and that the registrant would be precluded by his disclaimer from setting up in the future any exclusive right to the disclaimed part of it. * * *"

This Court is of the opinion that the same reasoning precludes Imperial from asserting that Philip Morris can use PLAYER'S only with the descriptive words "Navy Cut".

4. The fact that the B.A.T. agreement referred to "brands" and "trademarks" and the Ogden agreement spoke of "brands", is not of controlling significance in determining the scope of the opinion in United States v. American Tobacco Company, 221 U.S. 106, 31 S.Ct. 632 (1911) and the effect of the decree in United States v. American Tobacco Company, 191 F. 371, 417 (C.C.S.D.N.Y. 1911).

The terms "brands" and "trademarks", were of similar import insofar as they were used in connection with the product bearing a word trademark (as contrasted with a pictorial trademark). The term "brand" was generally used as a convenient or even a colloquial way to refer to a word trademark. See Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526 (1888).

5. Insofar as there may be a difference between the term "brands" and the term "trademarks", the brand which became the property of American was PLAYER'S. Even if the brand were PLAYER'S Navy Cut or PLAYER'S Medium Navy Cut or PLAYER'S Navy Cut Medium, nevertheless the word PLAYER'S, which is the trademark, is included in such phrases as the dominant word.

6. The trademark which became the property of American, and which was conveyed to Philip Morris, is PLAYER'S. Philip Morris has the exclusive right to use this trademark in the United States.

Philip Morris may use PLAYER'S without the descriptive words "Navy Cut" or without the sailor head device.

**VI.**

Philip Morris contends that regardless of the rights which it acquired by purchase, it has used PLAYER'S as a trademark and the sailor head device as a trademark for cigarettes since 1926. Based upon this use, it claims that it is now the owner in the United States of a good and valid common law trademark known as PLAYER'S and also a good and valid common law trademark—the sailor head device.

Imperial takes the position that Philip Morris' use of PLAYER'S and the sailor head device is immaterial on the ground

that Imperial's prior use dates back to 1900 and continues through its licensee's use and its own use subsequent to 1902.

On this issue the Court concludes:

 7. Use by Imperial before 1902 does not defeat Philip Morris' claim. These early sales were small. In any event, rights arising out of them were merged with the rights created by the Ogden agreement. Along with the rights created by the Ogden agreement, they were transferred to American by the 1911 decree.

8. The Court has previously concluded that the 1911 decree did not continue a licensor-licensee relationship. No document after the decree established American or Philip Morris as a licensee of Imperial. For this reason, Philip Morris' claim is not defeated by Imperial's contention that Philip Morris used PLAYER'S and the sailor head device as a licensee of Imperial.

 9. Imperial's shipments of cigarettes and smoking tobaccos bearing the mark PLAYER'S to the United States before 1957 were sporadic, casual and nominal in character and thus created no rights in Imperial and did not affect Philip Morris' rights to PLAYER'S in the United States. Menendez v. Holt, 128 U.S. 514, 521, 9 S.Ct. 143 (1888); Le Blume Import Co. v. Coty, 293 F. 344, 351 (2d Cir. 1923).

 10. PLAYER'S is a good, valid common law trademark owned by Philip Morris and the sailor head device is also a good, valid common law trademark owned by Philip Morris, resulting from the adoption of these marks and their extensive and continuous use since 1926 after four years' prior use under an arrangement with American, Trademark Cases, 100 U.S. 82, 94, 25 L.Ed. 550 (1879).

11. Philip Morris, as the owner in the United States of the common law trademark PLAYER'S and the common law trademark of the sailor head device, is entitled to the sole and exclusive use of

PLAYER'S and of the sailor head device on cigarettes and tobacco products in the United States.

### VII.

Philip Morris contends that its United States registration of PLAYER'S as a trademark for cigarettes, No. 552831, and its registration of the sailor head device as its trademark for cigarettes, No. 555064, are conclusive evidence of Philip Morris' exclusive right to use the registered mark in the United States.

Imperial claims that the registrations were in subversion of Philip Morris' obligations as a privy of Imperial, with the consequence that, in equity, the registrations belong to Imperial. Imperial also claims that Philip Morris, in substance, occupies the position of a "related company" of Imperial within the meaning of the Lanham Act, 15 U.S.C. § 1055.

On this issue the Court concludes:

12. Tillamook County Creamery Ass'n. v. Tillamook Cheese & Dairy Ass'n., 143 U.S.P.Q. 12, aff'd 345 F.2d 158 (9th Cir. 1965), petition for certiorari filed, 86 S.Ct. 239 (October 12, 1965) and Smith v. Dental Products Co., 140 F.2d 140 (7th Cir. 1944), upon which Imperial relies, are not controlling. These cases rest upon privity which previously existed between the claimants of the marks.

The 1911 decree not only severed the privity that was created by the Ogden agreement, but went much further. It authorized " * * * each company to treat as its own but only to the extent provided for in said contracts, all brands and trademarks which by said contracts it was given the right to manufacture and sell." It is the transfer of the brands and trademarks to American from Imperial which distinguishes this case from *Tillamook* and *Smith*. The 1911 decree refutes the major premise upon which Imperial bases its attack upon Philip Morris' United States registrations.

 13. Philip Morris' registrations of PLAYER'S and the sailor head device are prima facie evidence of the

validity, ownership and exclusive right to use the registered mark, 15 U.S.C. § 1057 (b).

The United States trademark registrations of Philip Morris, Nos. 552831 and 555064, have been constructive notice of Philip Morris' claim of ownership of the trademarks from the respective dates of the registrations in January and February, 1952, 15 U.S.C. § 1072.

The Commissioner of Patents' acceptance of Philip Morris' affidavits filed in 1957 with respect to the trademark registrations made the registrations incontestable, 15 U.S.C. § 1065 and § 1115(b).

The burden of establishing a defense which falls within one of the exceptions mentioned in 15 U.S.C. § 1115 (b) is upon Imperial. The defense must be pleaded affirmatively, Fed.R.Civ.P., 8(c). Imperial has not done this.

Philip Morris' registration was not surreptitious. Essential facts were not withheld from the Commissioner of Patents. Philip Morris did not practice any fraud. Imperial has failed to prove that any exceptions of 15 U.S.C. § 1115 (b) are applicable.

14. Title 15 U.S.C. § 1127 provides, in part:

"The term 'related company' means any person who legitimately controls or is controlled by the registrant or applicant for registration in respect to the nature and quality of the goods or services in connection with which the mark is used."

The exchange of information between the parties was voluntary and was not the exercise of control by Imperial necessary to establish Philip Morris as a "related company." See Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358, 366 (2d Cir. 1959); 4 Callmann, Unfair Competition and Trade-Marks, 2118–2124 (2d ed. 1950).

Furthermore, it should be observed that the statutory definition of a "related company" expressly requires legitimate control. This provision was inserted in the Act to prevent antitrust abuses. See Shniderman, Trade-Mark Licensing—A Saga of Fantasy and Fact, 14 Law & Contemp. Prob., 248, 252 (1949). The proceedings in the *American Tobacco* case prohibited Imperial from exercising control over its United States rivals. Hence, any control, if such did exist, would not be legitimate.

Following the 1911 decree, there was no related company or license relationship of any kind embracing either the PLAYER'S trademark or the trademark of the sailor head device in the United States between Imperial, on the one hand, and American or Philip Morris, on the other.

Philip Morris' registrations do not in equity belong to Imperial.

15. Upon the basis of 15 U.S.C. § 1115(b), Philip Morris is the absolute owner in the United States of the trademark set forth in United States Registrations Nos. 552831 (PLAYER'S) and 555064 (sailor head device).

## VIII.

16. Over a number of years before 1957, Imperial made shipments of nominal quantities of cigarettes and smoking tobacco bearing the mark PLAYER'S to the United States. These shipments were infringements of Philip Morris' trademark rights in PLAYER'S. The shipments were casual and nominal. They created no rights in Imperial, and had no effect on Philip Morris' rights to PLAYER'S in the United States. Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143 (1888); Le Blume Import Co. v. Coty, 293 F. 344, 351 (2d Cir. 1923).

Imperial's shipments since 1957 infringed upon Philip Morris' trademark rights in PLAYER'S.

17. Entirely apart from any other basis upon which Philip Morris claims its exclusive right to PLAYER'S in the United States, and even assuming that American acquired only PLAYER'S Navy Cut, Imperial has no right to use the term PLAYER'S in the United

States, either alone or in combination with other words, for cigarettes and tobacco products, since the term PLAYER'S is the distinguishing, dominant and salient feature of Philip Morris' trademark. John Wanamaker, Philadelphia v. Warner Bros. Co., 58 App.D.C. 284, 29 F.2d 872 (1928); Bunte Bros. v. Standard Chocolates, Inc., 45 F.Supp. 478 (D. Mass.1942).

18. Philip Morris has the exclusive right to advertise and sell in the United States tobacco products under the trademark PLAYER'S. It also has the exclusive right to use for this purpose the sailor head device.

19. Imperial has no right or privilege to advertise or sell tobacco products of any kind under the word PLAYER'S in the United States, except as it is permitted to do so by the written agreements between the parties concerning shipments to the British Embassy and British Armed Forces in the United States.

20. Imperial's contention that Philip Morris should be denied relief because the United States public recognizes that Philip Morris' PLAYER'S cigarettes have an English source of origin is without merit. At most, the evidence discloses that PLAYER'S is recognized as an English type cigarette. The evidence does not establish that the United States public believes that PLAYER'S cigarettes sold by Philip Morris in the United States are manufactured in England by Imperial.

Imperial's "English source of origin" argument, however, is subject to a more basic flaw. Imperial's position has already been decided adversely to it. The 1911 decree provided, in part:

"* * * each company to treat as its own * * * all brands and trademarks which by said contracts it was given the right to manufacture and sell, * * *."

The decree applied to English cigarettes sold in the United States. This Court finds no warrant for drastically limiting the effect of the decree on the ground that some of the cigarettes with which the decree was concerned might be recognized as being of English origin.

21. Imperial does not own the mark PLAYER'S throughout the world. Imperial is the owner of PLAYER'S in the United Kingdom and Ireland. In other parts of the world, except the United States, the owner of PLAYER'S is the British-American Tobacco Company. Imperial's use of PLAYER'S in the United Kingdom does not establish a right by Imperial to use the trademark in the United States. Indeed, to hold otherwise would be to disregard the proceedings dissolving the tobacco trust. Cf. A. Bourjois & Co. v. Katzel, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923).

It was not the purpose of the antitrust proceedings to exempt the parties from complying with established principles of fair competition. Imperial has never been restrained from competing in the sale of cigarettes and tobacco products in the United States under any trademarks it may choose which avoid a likelihood of confusion with Philip Morris' products. Imperial may not infringe Philip Morris' trademarks. Cf. Esso, Inc. v. Standard Oil Co., 98 F.2d 1, 8 (8th Cir. 1938).

22. Philip Morris is entitled to an injunction restraining Imperial, its officers, agents, servants, employees and attorneys, and those persons in active concert or participation with it, them or any of them, from using in the advertising, offering for sale or sale of cigarettes and other tobacco products into or in the United States the word PLAYER'S and any other designation which by colorable imitation or otherwise is likely to be mistaken for or confused with Philip Morris' trademark PLAYER'S; and from using for this purpose the trademark of the sailor head device and any other designation which by colorable imitation or otherwise is likely to be mistaken for or confused with Philip Morris' sailor head device trademark.

23. Philip Morris is entitled to an accounting for profits and damages as

prayed for in the complaint. Counsel are requested to confer to determine whether the amount due Philip Morris can be stipulated. The stipulation, of course, would be received without prejudice to the position taken by the parties on all other issues in the case. If the parties can not reach this stipulation the issue will be set for hearing or referred to a master.

24. Imperial's counterclaim will be dismissed with prejudice.

25. Philip Morris is entitled to recover its costs to be taxed by the Clerk of this Court. Philip Morris is not entitled to attorneys' fees as there is no evidence of bad faith or fraud on the part of Imperial. Century Distilling Co. v. Continental Distilling Corp., 205 F.2d 140, 149 (3rd Cir. 1953); Williamson-Dickie Mfg. Co. v. Davis Mfg. Co., 149 F.Supp. 852, 855 (E.D.Pa.1957), aff'd. 251 F.2d 924 (3rd Cir. 1958).